756 So.2d 1028 (2000)
NETWORK PUBLICATIONS, INC., Appellant,
v.
Russell BJORKMAN and Pamela Bjorkman, Appellees.
Nos. 5D99-1503, 5D99-2068.
District Court of Appeal of Florida, Fifth District.
March 24, 2000.
Rehearing Denied April 28, 2000.
*1029 Kimberly A. Ashby of Akerman, Senterfitt & Eidson, P.A., Orlando, and Robert W. Hughes, Jr., Hughes & Kaplan, Stone Mountain, Georgia, for Appellant.
David B. Mankuta, Margaret Z. Villella, Mark B. Milrot, and Simone P. Firley of Atkinson, Diner, Stone, Mankuta & Ploucha, P.A., Hollywood, for Appellee.
ANTOON, C.J.
In this consolidated appeal, Network Publications, Inc. (Network) appeals the final order entered by the trial court awarding Russell and Pamela Bjorkman damages after a jury found Network liable on the Bjorkmans' claim of breach of contract, and the trial court's subsequent ruling awarding prevailing party court costs to the Bjorkmans. We affirm the jury's finding of liability but must remand this matter for a new trial on the issue of damages because the trial court reversibly erred in issuing a curative instruction to the jury regarding the scope of expert testimony.
Network is a publishing company located in Georgia which owns and publishes "The Real Estate Book," a real estate sales promotion magazine. In September of 1989, the Bjorkmans executed an Associate Publisher's Agreement which entitled them to develop and distribute "The Real Estate Book" in Indian River County for a term of 15 years. The agreement provided, among other things, that Georgia law governed the terms of the parties' contract. At the time the agreement was executed, a Network representative executed a side agreement with the Bjorkmans which granted them the right of first refusal over the Brevard County territory.
The Bjorkmans began to operate their business in late 1990, under the name Treasure Coast Network, Inc. About one year later, the Bjorkmans discovered that Network had granted the Brevard County territory to Ray and Dale Starling without ever offering the territory to them. The Bjorkmans sued Network claiming a breach of their right of first refusal. The matter proceeded to trial and the jury determined that Network had breached its obligation to offer the Bjorkmans the right to publish the magazine in Brevard County before awarding the contract to the Starlings. The trial court entered a money judgment in accordance with the jury's verdict.
Network appeals the final judgment, raising several claims of error relating to the award of damages. Network primarily argues that the trial court reversibly erred in issuing a mid-trial instruction to the jury regarding the scope of expert testimony.
During trial, in an effort to establish their claim of damage, the Bjorkmans called two expert witnesses who testified that the Bjorkmans suffered a significant loss in profits as a result of Network's breach of contract. In response to this expert testimony, Network called Dr. Henry Fishkind, an economist, to testify as its expert on the issue of damages. During Network's examination of Dr. Fishkind, the trial court became concerned that Dr. Fishkind was being asked questions which fell outside the scope of permissible expert *1030 testimony and therefore the court interrupted the questioning to advise the parties of its concern. The court then cautioned counsel that "an expert can criticize the methodology of another expert, but he cannot criticize the other expert."
Questioning continued with counsel for Network asking Dr. Fishkind to explain why his damage calculations differed so significantly from the calculations reached by the Bjorkmans' experts. Dr. Fishkind responded by explaining that his methodology differed from that utilized by the Bjorkmans' experts. He also outlined the differences in the two methodologies. When asked whether, in his opinion, the Bjorkmans' experts used a reasonable methodology in estimating damages, Dr. Fishkind responded that he considered the experts to have used an "unreasonable methodology." Following this statement, the trial court called a bench conference during which the court provided case law to counsel relevant to the issue of the proper scope of expert testimony with regard to another expert's opinion. When the Bjorkmans' counsel moved to strike Dr. Fishkind's testimony as being improperly outside that scope, the trial court denied the motion but over objections issued the following curative instruction to the jury:
Member of the jury I would like to charge you as follows in connection with this testimony. You've heard testimony here about expert opinions, validity of expert opinions from the other side. I charge you that under Florida law it is improper for an expert witness to express an opinion as to the validity or the invalidity of an opinion expressed by the other side's experts.
Network maintains that this cautionary instruction was legally incorrect. We agree.
We begin by noting that the trial court was correct in initially advising counsel that "an expert can criticize the methodology of another expert, but he cannot criticize the other expert." In Mathis v. O'Reilly, 400 So.2d 795, 796 (Fla. 5th DCA 1981), rev. denied, 412 So.2d 468 (Fla. 1982), this court discussed the issue of the appropriate scope of an expert's testimony regarding the opinion of his or her counterpart, pointing out that a "question couched to cause [one expert] to delineate the facts, factors, formulae and rationale used in the analysis leading to the [opposing expert's opinion] and to do the same as to his own opinion and then to compare the predicates upon which the two opinions were based" is proper. The court went on to explain:
The result of such a comparison may show that defendant's witness failed to consider all proper factors, or considered improper factors, or erred in the weight or effect attributed to certain factors, in the selection or use of formulas or in actual calculations or in other reasoning processes and thus might tend to impeach defendant's witness ... However, we feel the real value of such a question and answer is in giving the jury a better insight into the bases supporting the two differing opinions so that the jury can better evaluate and weigh the testimony of the witnesses by understanding and comparing how, why and in what particulars, the two expert witnesses reached different conclusions.
Id. (Citations omitted). Thereafter, we addressed this issue again in Carver v. Orange County, 444 So.2d 452, 454 (Fla. 5th DCA 1983), where we clarified our opinion, ruling that it is improper for a trial court to allow an expert witness to impeach the credibility of an opposing expert by testifying as to his opinion of the opposing expert's ability. In so ruling, we cited to Ecker v. National Roofing of Miami, Inc., 201 So.2d 586 (Fla. 3d DCA 1967), wherein the third district explained that the `proper sense of professional delicacy precludes [experts] from giving evidence as to the merits of each other.' Id. at 588 (quoting Bremer v. Freeman, (1857) 100 Moo.P.C. 306, 362). Apparently perceiving the risks presented by the unrestrained use of experts in attacking the opinions of opposing experts, the Ecker court opined that "[a] trial should not be *1031 turned into a debate on irrelevant and immaterial issues such as the reputation of one expert witness, as determined or judged by the personal opinion of another expert witness for the other side." Id.
Review of this case law reveals that an expert may properly explain his or her opinion on an issue in controversy by outlining the claimed deficiencies in the opposing expert's methodology so long as the expert does not attack the opposing expert's ability, credibility, reputation, or competence. This rule recognizes that a trial should not be reduced to a debate regarding the ability, credibility, or reputation of an expert based on the perception of another expert.
Applying this case law to the instant facts, it becomes clear that the trial court's cautionary instruction failed to advise the jury of the controlling law on this issue. We recognize that the trial court's error arose as a result of the fact that, in drafting its instruction, the court relied upon language set forth by the court in Carlton v. Bielling, 146 So.2d 915 (Fla. 1st DCA 1962). In Carlton, defense counsel questioned his expert on whether the expert had an opinion as to the "validity" of the prior opinions expressed by the plaintiff's experts. On appeal, the first district held that such questioning was improper, explaining that questions which seek "to elicit an opinion of the witness as to the validity of opinions expressed by plaintiffs expert witnesses" is improper. Id. at 916 (emphasis added). This language referring to the "validity" of an opposing expert's opinion is imprecise, and as illustrated by the instant case, can lead to confusion. In any event, we conclude that the error occasioned by the issuance of the curative instruction in this case mandates the grant of a new trial on the issue of damages.
In closing, we note that Network argues that the trial court erred in awarding the Bjorkmans' their court costs. The cost award was based upon section 57.041 of the Florida Statutes (1997), which provides that "[t]he party recovering judgment shall recover all his or her legal costs and charges which shall be included in the judgment...." Since we have affirmed the jury's finding of liability, we also affirm the award of court costs. See Schneider v. DiPaola, 715 So.2d 284 (Fla. 2d DCA 1998).
AFFIRMED in part; REVERSED in part; and REMANDED.
DAUKSCH, J., concurs and concurs specially, with opinion.
HARRIS, J., concurs in part, dissents in part, with opinion.
DAUKSCH, J., concurring and concurring specially.
Although I do not perceive the asserted error to warrant a new trial, I consider half a trial better than the reversal of the judgment. Therefore, I will agree with the decision to the retrial on damages.
HARRIS, J., concurring in part, and dissenting in part, with opinion.
I concur with the majority's well reasoned opinion that liability was established (the breach of contract was admitted) and that the trial court erred in giving a midtrial instruction on the scope of expert testimony. From this instruction, set out in the majority opinion, the jury could reasonably have believed that the judge had determined that appellant's expert had expressed an opinion, contrary to law, about the opinions of plaintiffs' experts and therefore disregarded the testimony of defendant's expert. However, because I believe that the evidence of damages herein was too speculative to go the jury, I would instruct the trial court, on remand, to enter a verdict for plaintiffs for a nominal amount together with their costs.
As stated in Mathis v. O'Reilly, 400 So.2d 795, 796 (Fla. 5th DCA 1981), it is not improper for one expert "to delineate the facts, factors, formulae and rationale used in the analysis leading to the [other] witness' opinion and to do the same as to *1032 his own opinion and then to compare the predicates upon which the two opinions were based." By stating that the other expert relied on an improper methodology, that is what defendant's expert did in this case. Suppose this had been a personal injury action and the following testimony had been elicited:
"Doctor, you observed the defendant's expert testify. You saw that after he looked at this x-ray, he concluded that it was unnecessary for plaintiffs left arm to be amputated. How do you justify your conclusion that amputation was essential?"
"Dr. Smith has an excellent reputation as a diagnostician. Based on reviewing that x-ray, I would agree with him. Unfortunately, however, he reviewed the x-ray of plaintiffs right arm. I believe that to be an unreasonable methodology when considering the fate of the patient's left arm."
Defendant's expert did not attack either the character or motive of plaintiffs' experts. Nor did he improperly express an opinion relating to the validity of plaintiffs' expert opinion; he merely opined that plaintiffs' experts had looked at the wrong x-raythat the income methodology is inappropriate when reliable income data relating to the subject of inquiry is unavailable.
This leads into the question as to whether plaintiffs offered adequate proof to justify an award of damages other than nominal damages. I believe the record reflects clearly that they did not.
The basic facts are not in dispute. Defendant is the owner and publisher of "The Real Estate Book." Its business is located in Georgia. It entered into an associate publisher agreement granting plaintiffs the right to develop a local version of and distribute "The Real Estate Book" in Indian River County, Florida. In conjunction therewith, it gave plaintiffs the right of first refusal to so develop and distribute the product in Brevard County. The contract provided that it be construed under the laws of Georgia. Defendant admitted breaching this contract by granting the right to develop and distribute "The Real Estate Book" in Brevard to another without first offering the opportunity to plaintiffs.
Plaintiffs commenced operation in Indian River County in late 1990. About a year later, plaintiffs discovered that defendant had breached the contract by granting the Starlings the right to publish the Real Estate Book in Brevard. At trial, plaintiffs testified concerning their business operation in Indian River County. They commenced the business as its only "employees." The husband, who maintained his full-time employment as a fire-fighter in Miami, did the accounting end of the operation and took "99% of the photography" while the wife ran the day-to-day operation. She worked practically full time in selling advertisements to the local realtors. To assist in the business, she joined the local realtor group and the chamber of commerce. She described how she would visit the realtors on special occasions with gifts, etc. Her personal handson approach was successful and the business thrived. At the time of trial, the business had only one part-time employee other than plaintiffs.
In their breach of contract action, plaintiffs claimed damages for lost profits. The husband testified that they used a subchapter S corporation for their business operation. He testified that their net profits were determined by taking the gross receipts derived from the sale of advertising included in the book and subtracting the cost of publication. His K-1 form filed with his corporate tax return reflected the "profits" of the business by deducting the cost of operation of the business, excluding salaries for himself and his wife, from such gross profits.
Plaintiffs put on expert witnesses who opined that the profits lost by being denied the Brevard operation could be determined merely by arriving at a number of advertising pages that could be anticipated from the Brevard operation and multiplying that *1033 by the profit per page made on the Indian River business. This income approach is inherently wrong for two reasons. First, as pointed out by defendant, the advertising rates available in Indian River County may be substantially different from those in Brevard because of competitive forces and other market differentials. Hence, the amount of "income per page" determined for the Indian River County operation has no relationship to what could be expected in Brevard. Second, the cost of producing that book would also be drastically different. Based on this record, plaintiffs simply could not continue their present operation in Indian River County at its current level and also operate the Brevard operation without adding substantial assistance. While their operation in Indian River County counts as profit income which does not take into account the salaries of principle employees, the Brevard operation would be salary heavy. Clearly, the "profits" from the two operations would not be the same because the cost of production in Brevard County would be substantially greater. Hence, plaintiffs below failed to introduce any reliable evidence of either the gross receipts which could be expected from Brevard or the cost of production.
Both parties agree that Georgia law applies. Further, the parties agree that under Georgia law, lost profits may not be awarded to a new business because there is no history of income and any award would be too speculative. Plaintiffs contend that since they have an ongoing business operation which they intended to expand into Brevard County, they should not be considered a "new business" as contemplated by Georgia law. That they would not be operating a "new" business in Brevard is both true and false. If they were to operate the Brevard business under their current subchapter S corporation, then it is true that they would be operating under an existing business entity. But the business they would be operating would be completely different. Although the nature of the business in the two counties would be the samethe publication and distribution of "The Real Estate Book"the operation of the Brevard business would be an entirely different experience. The Indian River book would not merely be enlarged to accommodate the new territory. It would be a new, separate book, in a different area, based on sales of advertising to entirely different groups of realtors, involve differing competitive forces, and would require a different form of business management. Brevard County is a large land area as well as population area. It has several economic centers, as opposed to Indian River, with a different group of realtors associated with each economic center. That is why even plaintiffs' experts agreed that the counties were not comparable. The wife could no longer visit all the realtors and give them gifts, attend all their meetings, and join and attend all the chambers of commerce within the greater area. The husband would no longer be able to maintain his other employment and take 99% of the required photographs. Indeed, it is doubtful that he could do so on a full-time basis. In short, substantial additional employees would be required and this would, in turn, require a substantial change in management style. A Brevard expansion may not entail a new business organization, but it will certainly entail a new business operation.
Even if we assume that an ongoing business' entry into a new territory avoids the outright Georgia preclusion of lost profits, still we must consider the reason for the Georgia rule, not differing substantially from Florida's, which is that speculative damages may not be awarded.
Plaintiffs' counsel acknowledges that proof of damages based on lost profits in a new territory, which its own experts agree has no statistical correlation with the Indian River County market and whose demographics do not compare with Indian River County for analysis purposes, is difficult. But because the standard is difficult to achieve does not mean that the court should reduce the standard; it merely *1034 places a greater burden on the proponent to reach that standard. It is not an easy standard because the law does not intend it to be. Plaintiffs did their best, but, in my view, they failed to prove damages with the required certainty.
Plaintiffs' evidence offered to establish its lost profits was to introduce the K-1 prepared in conjunction with the business tax return which reflected the profit of its subchapter S corporation for its operation in Indian River County. As indicated earlier, the same profit margin could not be expected to apply to Brevard County. Although plaintiffs' experts testified that there was no statistical correlation between the markets of Indian River County and Brevard County and that the demographics of the two counties did not compare for analytical purposes, still they determined the Brevard lost profits by multiplying the Indian River County profit margin for each page of advertising times the number of pages of advertising which they project, based on plaintiffs' experience in Indian River County, would have been sold by plaintiffs in Brevard County. I have indicated earlier why I believe the "income" multiplier is speculative; now let's consider the "number of advertising pages" multiplier.
How did the experts arrive at their projected number of advertising pages which would be sold in Brevard? They asked plaintiff husband to give them a figure for the number of advertising pages that he believed could be sold in Brevard. They then asked him to reduce this number to a conservative number. He reduced the number to 110 pages per publication and they accepted this number without question. There was absolutely no record support for this number. There were no surveys in Brevard County as to how many realtors might advertise in the book, no comparative study of competing publications in the two counties, and no explanation as to why the selected number would be almost twice the number actually experienced by the new franchisee in Brevard County (except to say plaintiffs were exceptional people and had done an exceptional job in Indian River County). Nor do the experts explain a previous failure of a business which tried to sell "The Real Estate Book" in Brevard. Had plaintiffs analyzed the operation of the Starlings in Brevard, by far a more relevant indicator of lost Brevard profits, I suspect they would have found that after allocating a reasonable salary to the Starlings, an expense which would have faced plaintiffs in any such expansion, little or no "profit" remained. Perhaps that is why the approach was not taken.
The law of Georgia expressly prohibits lost profits to a new business with no history of profits. The reason is that Georgia courts reject speculative damages. Here, plaintiffs multiplied their Indian River "profit" (highly speculative if applied to Brevard) by a number of pages of advertising based on its Indian River operation (again highly speculative if applied to Brevard) and produced the highly speculative "lost profits" evidence which went to the jury and resulted in a verdict of $2,250,000 for lost profits of a business venture which plaintiffs never tried in a market which plaintiffs never tested and, in so far as this record indicates, which far exceeded the experience of the company actually operating in Brevard County.