892 So.2d 1204 (2005)
Lexter CABAN, Appellant,
v.
STATE of Florida, Appellee.
No. 5D03-579.
District Court of Appeal of Florida, Fifth District.
February 11, 2005.
*1205 James S. Purdy, Public Defender, and Susan A. Fagan, Assistant Public Defender, Daytona Beach, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Timothy D. Wilson, Assistant Attorney General, Daytona Beach, for Appellee.
*1206 THOMPSON, J.
Lexter Caban appeals his convictions for felony murder and aggravated child abuse in connection with the death of his live-in girlfriend's two-year-old son. Caban argues that this is a circumstantial evidence case and that the court should have granted his motion for judgment of acquittal. We affirm.
Caban, who worked nights, usually babysat the child and the child's older sibling during the day while the children's mother worked. On the day of the incident, a neighbor found Caban outside his apartment, crying and cradling the child in his arms as he tried to revive him by patting him and calling his name. According to the neighbor, the child was pale, his arms and legs were dangling, and his eyes were somewhat rolled back. Caban told the neighbor that the child had fallen off the bed. The neighbor called 9-1-1 and began CPR.
A crime scene investigator, who was a native Spanish-speaker, interpreted a conversation between Caban and a detective. Caban said he laid the child on the bed with a bottle. Caban was in the other room watching television with the other child and heard a scream. He ran into the bedroom and found the child with his fists clenched. He grabbed the child and ran out of the apartment with the child.
The state and the defense called expert witnesses to describe the child's injuries and how they occurred. Dr. Robert Gold, a pediatric ophthalmologist, testified that, consistent with shaken baby syndrome, the child had hemorrhages in all layers of the central retina of each eye, with no sign of external ocular trauma. He would not expect to see retinal hemorrhage result from a fall from a 32-inch-high bed onto a carpeted floor.
Dr. John Tilelli, an intensive care physician, testified that the CAT scan showed subdural blood, which usually occurs as a result of a direct impact. The child suffered a large, subdural hemorrhage that had to be evacuated, a diffuse injury to the tissues at the base of the brain, and retinal hemorrhages. In summary, the doctor testified, the child had both a translational or impact injury and also a rotational injury, and the history of falling off the bed was not consistent with the injuries or their severity. His opinion was that the child suffered shaken baby syndrome, or whiplash impact syndrome. Further, there was no severe event described that could explain why the child should have a severe head injury. The doctor explained that when a child is violently shaken, the head rocks to and fro, causing the child's brain to twist and turn. The twisting and turning causes injury to the brain and subsequent swelling. A manifestation frequently described is retinal hemorrhaging.
Dr. Tilelli testified that in 20 years, he had never seen a child as severely injured from a fall off a bed. When doctors see children who have fallen off beds they see skull fractures and some little subdural hematomas and occasionally a concussion syndrome, but never anything this massive. He thought it was highly likely that these injuries resulted from child abuse. He concluded, within a reasonable degree of medical certainty, that the child suffered shaking impact, and the history given, which did not include the child's head striking something hard or falling from a great height, did not provide any other explanation.
Dr. Ljubisa Dragovic, Chief Medical Examiner in Oakland County, Michigan, testified for the defense that he did not embrace the term shaken baby syndrome and that he would not use the term unless he observed bruises where the alleged perpetrator held the child as he shook it. On the other hand, a whiplash injury can occur when the head sustains either a soft impact or a transmitted impact. Dr. Dragovic *1207 testified that in his opinion, the child died of blunt force trauma to the head and complications thereof and not from shaking. It could have been caused by the child's being thrown against an unyielding surface or a fall.
Dr. John Plunkett, a forensic pathologist, testified for the defense that death was caused by a subdural hematoma, which was caused by an impact injury to the head. It could have been caused by someone slamming the child against a hard surface or by a roll from a bed. He thought it was unlikely that it occurred from a roll off the bed in this case, but the impact injury itself was relatively minor, and there was no associated skull fracture. More likely, the child was standing or jumping, which would have resulted in greater velocity. The conclusion he reached from his research was that short-distance falls can cause serious injury and death, that there may be a period of consciousness, and that retinal hemorrhage, regardless of its characteristics, cannot be used to determine the ultimate mechanism of injury and may be seen in impact injuries as a result of falls.
After the defense rested, the state called Dr. Randall Alexander, a professor of pediatrics. Dr. Alexander testified that he was an associate professor of pediatrics at Morehouse School of Medicine in Atlanta, Georgia and the Director of the Center for Child Abuse. He stated that since obtaining his medical degree in 1980, he worked as a pediatrician with additional training and emphasis on child abuse issues. He stated that he had participated in numerous studies that resulted in published articles on child abuse, including shaken baby syndrome. He had testified as an expert in approximately 250 cases.
Dr. Alexander testified that medical professionals by and large think that shaking a child without impact can cause severe injury. But, he testified, there are one or two people who will always disagree on something. Alexander did not think all the injuries to this child could have resulted from the child's having fallen from the bed, even if the child had been jumping on it. In such a case, a bruise might result or even a collar bone or skull fracture, but one would not expect to see the types of injuries that existed in the present case. He would not expect brain injuries, much less extensive brain injuries. Further, such a fall would not explain the retinal hemorrhaging because retinal hemorrhaging requires shaking or a monster impact. Alexander testified that to a reasonable degree of medical certainty, this case was one of shaken baby syndrome with impact. Retinal hemorrhages were observed even before the ophthalmologists arrived, one side of the brain was more affected than the other, and injured blood vessels caused bleeding. The brain injury was primary, and the subdural and retinal hemorrhages were secondary injuries, a constellation that is shaken baby syndrome.
Caban argues that the court erred in denying his motion for judgment of acquittal because the evidence did not exclude every hypothesis of innocence. A special standard of review of the sufficiency of the evidence applies where a conviction is wholly based on circumstantial evidence. State v. Law, 559 So.2d 187, 188 (Fla.1989) (citing Jaramillo v. State, 417 So.2d 257 (Fla.1982)). Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. Id. A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. Id. If the state does not offer evidence which is inconsistent with the defendant's hypothesis, the evidence would be such that no *1208 view which the jury may lawfully take of it favorable to the state can be sustained under the law. Id. at 189 (quoting Lynch v. State, 293 So.2d 44, 45 (Fla.1974)).
In the instant case, Caban's theories of innocence seem to have been either that the child fell off the bed, while jumping or otherwise, or that the cause of death was an injury that occurred at an earlier time. Dr. Tilelli testified that falling off a bed would not cause the injuries sustained by the child, and that instead, the child had suffered an impact and a rotational injury. Dr. Kessler testified that the injuries were not consistent with a fall from a bed. Dr. Alexander did not think all the injuries to this child could have resulted from the child's having fallen from the bed, even if the child had been jumping on it. He would not expect to see brain injuries in that scenario, much less extensive brain injuries, and the retinal hemorrhaging was not consistent with a fall because retinal hemorrhaging requires shaking or a "monster impact." Furthermore, Dr. Tilelli testified that the child's symptoms manifested themselves rapidly and that there were severe injuries to the areas of the brain involving consciousness and breathing, so the child could not have been "sitting with this kind of brain injury for a long period of time and then have a sudden deterioration." The child's mother testified that she spoke with Caban several times during the day about the children's well-being. She testified that Caban never said anything was wrong with the child. Because the above testimony contradicted Caban's theories of innocence, the court did not err in denying the motion for judgment of acquittal.
Caban also contends that the trial court erred when it qualified Dr. Alexander as an expert in the fields of pediatrics and child abuse. Caban argues that Dr. Alexander was not qualified to render an expert opinion regarding the cause of the child's death. Caban does not argue that Dr. Alexander is unqualified in the area of pediatrics. Rather, Caban argues that the opinion given by Dr. Alexander was outside his experience and training. He argues that the testimony concerning the death of the victim should have come from a pathologist or a physician who has been trained to conduct autopsies.
Alexander's education, medical experience, and prior experience as an expert witness were subject to voir dire by Caban's attorney. It is within the trial court's discretion whether or not a witness can be designated an expert and that ruling will not be reversed unless there is a showing of clear error. Provenzano v. State, 750 So.2d 597, 602 (Fla.1999) Here, Dr. Alexander had two decades of experience in pediatrics with additional training in child abuse issues. He is a published authority and had been qualified as an expert and testified in approximately 250 cases involving pediatrics and child abuse. We cannot say that the trial court abused its discretion in designating him as an expert. See Ramirez v. State, 542 So.2d 352 (Fla.1989). Finally, we find that Dr. Alexander's rebuttal testimony, although slightly cumulative, was presented to show that the defense's experts' theories were generally not accepted by medical professionals. Compare Britton v. State, 414 So.2d 638 (Fla. 5th DCA 1982).[1]
AFFIRMED.
GRIFFIN and PLEUS, JJ., concur.
NOTES
[1] We find no merit in Caban's argument that the prosecutor's closing remarks created a fundamentally unfair trial.