**In re Terri L. STEFFEN, Debtor.**

**Terri L. Steffen, Overseas Holdings Limited Partnership, and Paul A. Bilzerian, Plaintiffs,**

**v.**

**Rob Turner, Property Appraiser of Hillsborough County, Florida and Doug Belden, Tax Collector of Hillsborough County, Florida, Defendants.**

**Bankruptcy No. 8:01–BK–09988–ALP. Adversary No. 8:05–AP–64–ALP.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Jan. 31, 2006.

Herbert R. Donica, Herbert R. Donica P.A., Harley E. Riedel, II, Stichter, Riedel, Blain & Prosser, Tampa, FL, for Debtor.

## FINDING OF FACT, CONCLUSIONS OF LAW AND *MEMORANDUM OPINION*

(Doc. No. 9)

ALEXANDER L. PASKAY, Bankruptcy Judge.

THE MATTER under consideration in this Adversary Proceeding in the Chapter

11 case of Terri L. Steffen (Debtor) is a claim asserted by the Debtor in her Amended Complaint. (Doc. No. 9) (the Complaint). Overseas Holdings Limited Partnership (OHLP) joined as co-plaintiff and, by virtue of an Order entered by this Court on September 27, 2005 (Doc No. 99), Paul A. Bilzerian (Bilzerian), the Debtor's husband, was added to this Adversary Proceeding as an involuntary Plaintiff (together, Steffen, OHLP, and Bilzerian are referred to as Plaintiffs).

The Complaint names Rob Turner, the Property Appraiser of Hillsborough County, Florida (Property Appraiser), and Doug Belden, the Hillsborough County, Florida Tax Collector, in their official capacities, as defendants (together, Defendants). The Adversary Proceeding concerns the appraisal of real property located at 16229 Villarreal de Avila, Tampa, Florida 33613; Lots 19, 20, and 21, Block 5, Avila Unit No. 5, Plat Book 59, page 44, Hillsborough County, Florida (the Property). The Plaintiffs seek a judgment setting aside the appraisal of the Property for the assessment of ad valorem tax purposes; entering a proper assessment; and ordering the Tax Collector to refund to the Debtor any excess taxes paid by the Debtor on account of the allegedly improper assessment.

The ad valorem tax assessment on the Property, as of January 1, 1995, was made based on a just value of $4,836,928. It is the Plaintiffs' contention that this assessment exceeds the just value of the property, and was not made in compliance with section 193.011, Florida Statutes (2005). The Plaintiffs contend that the Property Appraiser failed to consider properly the criteria set forth in section 193.011. In support of this proposition, the Plaintiffs first contend that the Property Appraiser failed to consider the size of the improvements. The size of the improvements determined by the Property Appraiser as appeared from the Property Card pursuant to the CAMA System Calculations is 30,720 square feet. It is now without dispute that the correct size of the improvements is 28,363 square feet, which includes both the main house and the guesthouse.

Second, the Plaintiffs contend that the Property Appraiser failed to consider the conditions of the improvements required by section 193.011(6). The Property Card generated by the use of the CAMA System described the flooring of the property as: Fifty (50) percent marble and fifty (50) percent hardwood. According to the Plaintiffs, only ten (10) percent of the flooring is marble, ten (10) percent is hardwood and the remaining eighty (80) percent is carpet.

Third, according to the Plaintiffs, the Property Appraiser miscounted the number of fireplaces and indicated there were twelve fireplaces. It is without dispute there are only six fireplaces.

Fourth, the Plaintiffs contend that the Property Appraiser failed to include physical depreciation due to the condition, which existed on January 1, 1995, that resulted in the Plaintiffs having to replace all the windows of the Property. The cost to replace the windows, according to the cost estimate, was approximately $464,000.

Fifth, Plaintiffs contend that the Property Appraiser failed to discount the assessment to reflect the costs of sale.

Finally, in the alternative, the Plaintiffs contend that the assessment made by the Property Appraiser was arbitrary and based on appraisal practices that are different from those used in the same area. Based on the foregoing, the Plaintiffs request relief from the assessments made on the Property for the years 1995–2004.

The Defendants timely filed their Answer opposing the relief sought by the

Plaintiffs in the Complaint. In addition, the Defendants filed a Motion to Dismiss and to Abstain. The Motion was heard in due course and this Court in its Order on the Motion permitted the Plaintiffs to pursue this action solely with regard to the year 1995. As a result, only the valuation of the Property and the assessment and payment of the ad valorem taxes for the year 1995 is properly before this Court at this time.

In due course, the remaining issues raised by the pleadings were scheduled for trial at which time this Court heard testimony of witnesses and, having considered the entire record, including documents admitted into evidence, now makes the following findings of facts and conclusions of law.

The Property involved in this controversy is located on three lakefront lots over three acres of land in the exclusive subdivision of Avila, with the improvements consisting of an approximately 23,000 sq. ft. main house with an attached guesthouse of approximately 5,000 sq. ft. In 1995, the Property was not only the largest residence in Hillsborough County, but was significantly larger than the next largest home in the subdivision. The main house includes: indoor basketball (including bleachers and a scoreboard) and racquetball courts; a movie theater; an elevator; a seven-car garage; four Strauss Austrian crystal chandeliers; four fireplaces; a boat ramp and dock; and a secret bookcase. The house is described in sales materials as "an extraordinary mansion of world class stature." (Def's. Exh. 1).

Before considering the contentions advanced by the Plaintiffs, it should be noted that county property appraisers are constitutional officers, entitled to a presumption that their actions are taken in accordance with the law. Assessments of property for ad valorem tax purposes fall under the discretion of the officer, and are presumed correct. *See Spanish River Resort Corp. v. Walker*, 497 So.2d 1299, 1303 (Fla. 4th DCA 1986) (citing *Powell v. Kelly*, 223 So.2d 305, 307–308 (Fla.1969)). However, the discretion of the office and the presumption of correctness are not unassailable; their discretion is limited by statute. *See* § 193.011, Fla. Stat. Even so, the taxpayer challenging the assessment must prove more than a difference of opinion as to the just value of the property. *Powell*, 223 So.2d at 307–308; *Keith Invs., Inc. v. James*, 220 So.2d 695, 696 (Fla. 4th DCA 1969).

Though the property appraiser may exercise discretion, this discretion is limited. The Florida Constitution requires a "just valuation of all property for ad valorem taxation." Art. VII, § 4, Fla. Const. The Florida Supreme Court has equated "just valuation" with "fair market value." *Valencia Center, Inc. v. Bystrom*, 543 So.2d 214, 216 (citing, *Walter v. Schuler*, 176 So.2d 81, 85–86 (Fla.1965)). The property appraiser is required by statute to take into consideration the following factors:

"(1) The present cash value of the property, which is the amount a willing purchaser would pay a willing seller, exclusive of reasonable fees and costs of purchase, in cash or the immediate equivalent thereof in a transaction at arm's length;

(2) The highest and best use to which the property can be expected to be put in the immediate future and the present use of the property . . .;

(3) The location of said property;

(4) The quantity or size of said property;

(5) The cost of said property and the present replacement value of any improvements thereon;

(6) The condition of said property;

(7) The income from said property; and (8) The net proceeds of the sale of the property, as received by the seller, after deduction of all of the usual and reasonable fees and costs of the sale. . . ."

§ 193.011, Fla. Stat.

### FAILURE TO CONSIDER CRITERIA

The Plaintiffs contend that the Property Appraiser failed to consider properly the criteria in section 193.011. The valuation for ad valorem taxation purposes was made by utilizing a so-called Computer Aided Mass Appraisal (CAMA) system. Relevant information for a particular parcel is put into the CAMA system by the field representative of the Property Appraiser, and the result is recorded on a property card. As shown by the 1995 Property Card for the Subject Property, the value determined from the CAMA system was $4,836,928. (Pl's. Exh. 2).

■ The Plaintiffs contend that the Property Card contains erroneous information, demonstrating a failure to properly consider several of the required factors in arriving at just value. First, the Plaintiffs contend that the Property Appraiser failed to properly consider the size of the improvements of the Property. § 193.011(4), Fla. Stat. The Property Card reflects that the Property Appraiser used 30,720 square feet in the CAMA system calculation. However, the parties stipulated, the Defendants' valuation expert witness based his report upon, and Bilzerian testified that the correct size of the improvements was 28,363 square feet, which included both the main house and the attached guest house.

Terry LoCicero, one of the employees of the Property Appraiser responsible for overseeing the CAMA system, testified that measurements are taken from the outside of the home, and the system compensates for this. Trial Transcript of Final Evidentiary Hearing dated October 11, 2005, pages 53, line 12 to pages 54 line 7. Future reference will be (Trial Tr. p. ——, l. ——). The number used by the Property Appraiser differs only slightly, as a percentage, from that given by Bilzerian, and clearly not by enough of a margin to constitute a failure to consider the size of the improvements. *See Sec. Mgmt. Corp. v. Markham,* 516 So.2d 959 (Fla. 4th DCA 1987) (assessment exceeds just valuation when based on a 1,500 unit density, not 236 unit density).

■ Second, the Plaintiffs contend that the Property Appraiser failed to properly consider the condition of the improvements. § 193.011(6), Fla. Stat. According to the Property Card, the CAMA system treated the Property flooring as 50 percent marble and 50 percent hardwood. According to Bilzerian's testimony, the Subject Property flooring was 10 percent marble, 10 percent hardwood, and 80 percent carpet. However, there was testimony that a significant amount of the first floor was marble. (Trial Tr. p. 194, l. 21).

The Property Card also showed that the Property Appraiser miscounted the number of fireplaces, using 12 instead of 6. Clearly the number of fireplaces is not contested. However, it is also clear that any increase in the assessment caused by the miscount is insufficient to establish that the Property Appraiser failed to properly consider the condition of the improvements. The Property Card shows that the value given to the fireplaces was $2500, which would equate to an error of $15,000, a miniscule number in a $4.8 million assessment. Similarly, the calculation based on the flooring is inadequate to overcome the presumption of correctness. There was no value attributed to the flooring, and any mistake was one in the CAMA system, that would not have been made by the persons inspecting the site.

Lastly, Plaintiffs contend that the Property Appraiser failed to include physical depreciation due to the condition of the windows as of January 1, 1995. There was ample testimony that a serious window problem occurred, such that by 1994 Plaintiffs had to replace all the windows in the Property. (Trial Tr. pp. 79–80, 154–158). Robert Kelley, the former attorney for the Debtor in state court property tax disputes, testified that representatives of the Property Appraiser examined the windows, and that he provided copies of the cost estimates for the replacement of the windows, which amounted to approximately $464,000. (Trial Tr. pp. 21–25, 34); (Pl's. Exhs. 5, 6). Tim Wilmath, the Defendants' expert's report takes the condition into account in his appraisal report. (Def's. Exh. 3).

James Glaros, the director of assessments for the Property Appraiser in 1995, testified that he was fully aware of the windows condition. (Trial Tr. p. 70, l. 2). A 30 percent adjustment was made to the Property, based on, among other things, the conditions of the windows. (Trial Tr. p. 70, l. 19—p. 71, l. 9). The Plaintiffs contend that there was no explanation as to how the percentage was proportioned between the causes, and the Property Appraiser thus failed to consider the condition of the windows in determining the value of the property. However, based on Glaros' testimony, this Court is satisfied that the condition was accounted for in the assessment, and that the Property Appraiser properly considered the factor.

■■ Plaintiffs also contend that the Property Appraiser failed to discount the assessment to reflect the costs of sale. The exclusion of the costs of sale can, in certain circumstances, amount to a failure to consider properly the statutory criteria. See Hausman v. VTSI, Inc., 482 So.2d 428 (Fla. 5th DCA 1985) (assessor not entitled to presumption where failed to consider sales costs that amounted to approximately 57% of gross sales price). However, there is no legal requirement that the net sale proceeds of a sale constitutes the deciding factor. The statute requires that the property appraiser consider the factors listed in section 193.011, not necessarily that the property appraiser apply them. § 194.301, Fla. Stat. (2005) A property appraiser is merely required to consider all of the statutory criteria, and has the discretion to discard any specific factors that are not indicative of just value under the circumstances. *Turner v. Tokai Fin. Servs., Inc.*, 767 So.2d 494 (Fla. 2d DCA 2000). The property appraiser has the discretion to determine the proper method of valuation, and when applied lawfully, the determination according to the chosen method is correct. *Oyster Pointe Resort Condo. Assoc., Inc. v. Nolte*, 524 So.2d 415, 417 (Fla.1988) (citing *Blake v. Xerox Corp.*, 447 So.2d 1348 (Fla.1984)). The failure to reduce the assessment for the costs of sale is not a failure to consider the criteria.

### ASSESSMENT WAS ARBITRARY

■■ The Plaintiffs contend in the alternative that the assessment made by the Property Appraiser was arbitrary because the appraisal was based on practices different from those used in the same area, and therefore, it is not entitled to the presumption of correctness.

The appraisal system used in 1995 was based on the "effective rate" applied to the property in question on that year, multiplied by the effective area in order to determine the value of the improvements. (Trial Tr. p. 50, l. 13). The Effective Rate depends on a quality adjustment rating (in 1995, on a scale of 1 to 6), that the CAMA system takes into account, along with the quality of construction and the type of improvements, to generate a value per square foot. (Trial Tr. p. 41, l. 11). The

quality rating is a subjective determination made by the site inspector for the Property Appraiser. (Trial Tr. p. 41, l. 16–20).

The main house and guest house were both rated with a quality adjustment rating of 5, with an effective rate of $181 per square foot. The Plaintiffs contend that this was in excess of the quality factor and effective rate of the houses in the area, and was made arbitrarily, forfeiting the presumption of correctness.

Jeff Cummings was the crew chief responsible for the appraisal in 1995. He has been involved in the appraisal of approximately 15,000 homes annually with the Property Appraiser. (Trial Tr. p. 61, l. 20). The rate is based on a subjective determination, made at the time of inspection for assessment purposes, based on the quality of the construction of the house, the configuration of the house (number of bedrooms, bathrooms, square footage, etc.), and other factors. (Trial Tr. p. 58, l. 1–13). It is clear from the record that the Property is a luxury mansion, with certain amenities not typically found in most homes. Although Cummings was not able to clearly articulate the basis for the rate set at level five for the property, based on the square footage, the mix of marble and hardwood floors, and the amenities and features of the Property, this Court is satisfied that the Plaintiffs have failed to prove that the determination of the effective rate was made arbitrarily.

### EXPERT TESTIMONY ON JUST VALUE

■ At the trial, each side presented the expert testimony of an appraiser in support of their respective claims as to the just value of the Property as of January 1, 1995. Joseph Ayo, the Plaintiffs' expert, testified that the just value of the Property, as of January 1, 1995, was $2,119,000.[1] Tim Wilmath, the Defendants' expert, testified that the just value of the Property, as of January 1, 1995, was between $4,500,000 and $4,800,000.

### TESTIMONY OF JOSEPH AYO

Both experts arrived at their expert opinions using an analysis of both a market approach and a cost approach to valuation. (Trial Tr. p. 113, l. 20; Tr. p. 228, l. 15). Ayo's ultimate conclusion consisted of several components: an estimate of the value of the land; an estimate of the cost to rebuild the improvements as of January 1, 1995; and a reduction for functional obsolescence. (Pl's. Exh. 1).

In computing the land value estimate, Ayo used land sales from Avila properties. (Trial Tr. p. 103, l. 8). The comparable lot sales were three golf course fronting lots, one from 1986, two from 1983, and the Property, which was sold in 1987. From these sales, Ayo concluded that the just value of the land as of January 1, 1995 was $799,000.

The cost approach values the improvements by estimating what it would cost to rebuild the improvements as of the date of valuation. In computing the cost to rebuild the improvements, Ayo testified that he looked at the Marshall & Swift Valuation Service (M & S) cost analysis and

---

1. Plaintiffs also offered Bilzerian's testimony as to the value of the Property as of January 1, 1995. (Trial Tr. p. 168, l. 6–20). A property owner generally is qualified, on account of ownership, to testify as to the value of his or her property. *Weitzer Oak Park Estate, Ltd. v. Petto,* 573 So.2d 990 (Fla. 3d DCA 1991); *Horn v. Corkland Corp.,* 518 So.2d 418 (Fla. 2d DCA 1988); *Harbond, Inc. v. Anderson,* 134 So.2d 816, 819 (Fla. 2d DCA 1961). Bilzerian testified that his opinion as to value was the same as Ayo's, and included a deduction for the cost to replace the windows, functional obsolescence, and costs of sale. (Trial Tr. p. 168, l. 17).

interviewed the builder, Martin Roberts, who had completed the construction of the house. (Trial Tr. p. 99, l. 20; Tr. p. 149, l. 15). Ayo relied on Roberts for his conclusion of the cost to rebuild the home, stating that in his opinion the local opinion of the actual builder of a house was more reliable than a general cost service. (Trial Tr. p. 49, l. 15). Based on Roberts' statement that the improvements would cost $100 per sq. ft. to build in 1995, Ayo concluded that the cost to rebuild the improvements on the Property was $3,368,650.

Ayo calculated the value of the Property, under the cost approach, by subtracting the total depreciation of the Property from the cost to rebuild, and adding that figure to the land value. The depreciation calculation consisted of two elements: physical depreciation and functional depreciation, or functional obsolescence. Physical depreciation is based on the total economic life of the structure, for which Ayo used 50 years, and the effective age, together with any curable defects (in this case, the rotted window conditions). Ayo concluded that there was $672,119 in physical depreciation as of 1995.

In determining functional obsolescence, Ayo compared a group of sales of large homes, splitting the houses into sales of homes of less that 7,000 sq ft., sales of homes of between 7,000 and 10,000 sq. ft., and sales of homes over 10,000 sq. ft. (Trial Tr. p. 104, l. 25); (Pl's. Exh. 1). Ayo identified a 13% reduction in the sales price of homes over 7,000 sq. ft. compared to those over 7,000 sq. ft. (Pl's. Exh. 1). According to Ayo, as the square footage of a house increases, the price the market is willing to bear decreases. (Trial Tr. p. 127, l. 8, p. 132, l. 23). He testified that "given this population and this data set, it followed the economies of scale that the

price per unit falls as the gross becomes larger." (Trial Tr. p. 132, l. 23).

Ayo based his conclusion that the house suffered from functional obsolescence on not only the super-adequate size of the improvements for the market, but the difference in quality between the first floor of the main house and the rest of the improvements. (Trial Tr. p. 110, l. 6). Ayo concluded that the market estimate of the improvements was $1,918,150, based on an estimate of $100 sq. ft. for the first 10,000 square feet of the improvements, and $50 sq. ft. for the remaining 18,363 square feet. Based on this market estimate of the improvements, Ayo estimated the functional obsolescence of the improvements to be $778,381.

Ayo arrived at his ultimate opinion by taking the cost to rebuild, subtracting the physical and functional depreciation, and adding the value of the land to conclude that the just value, based on the cost approach to value, was $2,584,000. (Trial Tr. p. 113, l. 13).

Ayo actually relied on his market approach analysis to reach his ultimate conclusion of the just value of the Property. Relying on the chart prepared to support the functional obsolescence calculation, Ayo determined that the value, based on comparable sales, was $1,918,150. (Trial Tr. p. 108, l. 2–23); (Pl's. Exh. 1). Ayo subtracted the cost to replace the windows from this amount, then added the value of the land to reach a total just value estimate of $2,119,000, which constituted his ultimate opinion. (Pl's. Exh. 1).

### TESTIMONY OF TIM WILMATH

Tim Wilmath, the Defendants' expert appraiser, differed from Ayo on most points in his opinion of the just value of the Property as of January 1, 1995. In determining the land value estimate, Wilmath used land sales from the Avila subdivision, using sales that occurred in 1994, 1993,

1991, and the 1987 sale of the Property. These sales were all waterfront lots in Avila. (Trial Tr. p. 212, l. 20). Wilmath concluded that the value of the land was $6.00 per sq. ft. for a total value of approximately $900,000. (Trial Tr. p. 213, l. 3).

Wilmath used the M & S, which has a special section for luxury homes, to determine the cost to rebuild the improvements. (Trial Tr. p. 215, l. 2). Wilmath testified that, in his opinion, the actual costs were unavailable. (Trial Tr. pp. 213–214). Bilzerian never gave an actual cost to build the house. (Trial Tr. p. 180, l. 17). Wilmath did not rely on Roberts' estimate of $100 per sq. ft. because Roberts testified in a deposition that he started on the project when it was 75% complete, and did not have any bills or invoices to demonstrate the actual cost information. (Trial Tr. pp. 251–256). Wilmath therefore concluded that the M & S, using a blended rate to approximate the features and amenities of the home, was the best method of estimation. (Trial Tr. pp. 247–249). Using the M & S, average cost numbers for luxury homes, Wilmath arrived at a cost to rebuild of $144.07 per sq. ft., for a total of $4,086,257. (Trial Tr. p. 217, l. 8).

Wilmath deducted the costs of depreciation, both for the age of the structure based on the age-life method with an expected useful life of 65 years, and the condition of the windows. (Trial Tr. p. 217, l. 19; Tr. p. 221, l. 4). However, Wilmath did not apply a deduction for functional obsolescence. (Trial Tr. p. 218, l. 4). The house does not suffer from functional obsolescence because, based on his analysis of the market, as this type of luxury mansion gets bigger, and gets more luxurious, there are more amenities, and it is more expensive. Wilmath testified that although the home is large, it "doesn't stick out like a sore thumb" and actually "fits into Avila very well." (Trial Tr. p. 219, l. 17). When the depreciation was deducted from the cost to rebuild estimate, and the land value added in, Wilmath reached a just value estimate of $4,838,000. (Trial Tr. p. 221, l. 11).

Wilmath also considered a market approach, based on the sales prices of five properties.[2] One of the properties was located in Avila, two in the Windemere area of Orlando, one in south Tampa, and one in Pinellas county; all of the sales occurred between 1993 and 1999. (Trial Tr. pp. 222–226); (Def's. Exh. 3, pp. 34–38). Wilmath adjusted the sales prices to factor out the land values, to compensate for age, condition, existence and size of a guesthouse, and amenities. (Trial Tr. pp. 226–228); (Def's. Exh. 3, pp. 39–42). Based on the sales, Wilmath estimated a value of $4,550,000. (Trial Tr. p. 228, l. 15); (Def's. Exh. 3, p. 42).

This Court finds the analysis of Defendants' expert more convincing.[3]

---

**2.** The Debtor testified that the Property was sold in 2004 for $2.5 million. (Trial Tr. p. 87, l. 20). Wilmath disregarded the 2004 sale of the Property. He testified that the reason for this were: the sale occurred nine years after the valuation date; shortly after the sale the Property was relisted for $10 million; and, the distressed nature of the sale. (Trial Tr. p. 211, l. 10). In fact, the property involved had been sold by the Receiver appointed by the United States District Court for the District of Columbia. *See SEC v. Bilzerian,* 127 F.Supp.2d 232, 232 (D.D.C.2000). It does not need elaborate discussion concerning the fact that this was clearly a distressed sale and a distressed sale certainly does not bring a price which is even near or close to the appraised value of the property.

**3.** The Court has also considered the testimony of Lawrence Jay, the Defendants' review appraisal expert. The Defendants offered Jay's testimony to critique the methodology and conclusion of Ayo's opinion. The Plaintiffs, citing *Network Publications, Inc. v. Bjorkman,* 756 So.2d 1028 (Fla. 5th DCA 2000), objected

Neither expert made any adjustments to the comparable sales in determining the just value of the land. However, the sales Ayo used occurred almost ten years before the date of the assessment, and were not adjusted for the difference in time, while those used by Wilmath occurred significantly closer in time to the date of the assessment. In addition, the sales used in Wilmath's market analysis more closely resemble the size and amenities of the Property than do those in Ayo's analysis.

Both experts agreed that the actual cost to build the improvements would be relevant and helpful in determining the cost to rebuild the improvements in 1995. However, Ayo's exclusive reliance on an estimate from the builder, when it was undisputed that the builder only completed a portion of the project, is troubling. This Court is inclined to give more weight to the estimates from the M & S service.

Plaintiffs argue that Wilmath should have made an adjustment for functional obsolescence, and pointed out that every other appraiser involved in the case had done so. (Trial Tr. pp. 233–235). However, in his opinion, the house was not super-adequate, but had amenities that were unique and marketable and on par with those in the wider marketplace. (Trial Tr. p. 220, l. 18); (Def's. Exh. 3, p. 22). Wilmath testified that the amenities extended the market for the Property beyond the confines of its immediate physical location, and that any limitation on demand in the past was due to improper marketing, not functional obsolescence. (Trial Tr. pp. 235–237).

Ayo extrapolated a percentage for the difference between two categories of homes, without giving a rationale for the significance of the line dividing the houses into categories. Moreover, there was no correlation between the 13 percent reduction in the two categories to the 50 percent reduction applied to the second floor of the main house and the guesthouse in his calculations. Additionally, no adjustment was made for differences of comparable properties. Ayo testified that this is not a typical approach to a market analysis. (Trial Tr. p. 146, l. 14).

### CONCLUSION

Clearly, the process of appraising the largest house in the county is a difficult one, and demonstrates that appraisal of property is often more an art than a science. Both parties agree on the burden of presumption and the standards governing the burden in this case. The assessment made by the property appraiser is presumed correct, unless the taxpayer shows by a preponderance of the evidence that the appraiser: (1) failed to consider properly the criteria in section 193.011; or, (2) the assessment is arbitrarily based on appraisal practices which are different from the appraisal practices generally applied by the appraiser to comparable property within the same class and within the same county. § 194.301, Fla. Stat. If the presumption of correctness is overcome, then the taxpayer must show by a preponderance of the evidence that the assessment is in excess of just value. *Id.* If the appraisal is presumed correct, then the

---

on the grounds that an expert must form an opinion as to value before he can testify and criticize another expert. (Trial Tr. p. 262). While this Court agrees that attacking an opposing expert's ability, credibility, or reputation is beyond the scope of expert testimony envisioned by the rules of evidence, Jay has not criticized Ayo's ability, credibility, or rep-

utation, he has merely critiqued Ayo's expert opinion given in this case. Jay testified this type of review appraisal is recognized by the Uniform Standards of Professional Appraisal Practice, (Trial Tr. p. 258, l. 8), and this Court agrees that such an opinion is a proper basis for expert testimony.

taxpayer must show by clear and convincing evidence that the assessment is in excess of just value. *Id.*

This Court is satisfied that the proof presented by the Plaintiffs falls far short of the degree of proof required to overcome the presumptive validity of the assessment and the determination made by the Property Appraiser of the just value of the Property. To sustain this burden and overcome the presumptive validity, showing a mere difference in opinion as to the value is not sufficient. *Keith Invs., Inc. v. James,* 220 So.2d 695, 696 (Fla. 4th DCA 1969); *Palm Beach Mall, Inc. v. Walker,* 585 So.2d 1149, 1150 (Fla. 4th DCA 1991). In order to overcome the presumption of correctness the challenging party has a duty to present hard believable evidence and not such evidence that supports only an opinion. Based on the foregoing this Court is satisfied that the assessment made by the Property Appraiser is correct and should not be disturbed.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Amended Complaint (Doc. No. 9) be, and the same is hereby, dismissed with prejudice.

A separate final judgment shall be entered in accordance with the foregoing.

### FINAL JUDGMENT

THIS CAUSE came on for consideration upon the Court's own Motion for the purpose of entering a Final Judgment in the above-captioned adversary proceeding. The Court has considered the record and finds that this Court has entered its Findings of Fact, Conclusions of Law, and Memorandum Opinion. This Court sees no reason why a final judgment should not be entered. Therefore, it appears appropriate to enter this Final Judgment.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that Final Judgment be, and the same is hereby, entered in favor of the Defendants, Rob Turner and Doug Belden, and against the Plaintiffs, Terri L. Steffen, Overseas Holdings Limited Partnership, and Paul A. Bilzerian. The Amended Complaint (Doc. No. 9) is dismissed with prejudice.