*51
 
 GRIFFIN, J.
 

 Defendant, Lexter Caban [“Caban”], appeals the summary denial of his rule 3.850 motion for post-conviction relief. We find that one issue has merit and requires reversal.
 

 On July 19, 1999, Caban was babysitting the two children, ages five and two, of his girlfriend while she was at work. A passerby found Caban outside the apartment, crying, and in search of help while cradling Jonathan, the two-year-old, and trying to rouse him. Caban said that he had put Jonathan in bed for a nap, and Jonathan had fallen off the bed. The passerby summoned her brother who performed CPR until paramedics arrived.
 

 Jonathan was transported to Osceola Regional Hospital. Dr. Kenneth Byerly noted that Jonathan had bruising over the right eyelid and was experiencing intermittent seizures. The right pupil was dilated, indicating to Dr. Byerly a right side intracranial injury. A CAT scan was performed and surgery was immediately performed to evacuate a large subdural hema-toma. During the procedure, Jonathan went into cardiac arrest, and he was airlifted to the intensive care unit at Arnold Palmer Hospital. Three days later, Jonathan died.
 

 Caban was charged with first-degree felony murder and aggravated child abuse. He was found guilty of those charges and was sentenced to natural life on the murder charge and a concurrent ten-year term of imprisonment on the aggravated child abuse conviction. His judgment and sentence were affirmed on appeal.
 
 See Caban v. State,
 
 892 So.2d 1204 (Fla. 5th DCA 2005).
 

 On direct appeal, the main contention was that there was insufficient circumstantial evidence of guilt and the trial court should have granted Caban’s motion for judgment of acquittal. Caban contended that the child had sustained the fatal injury when he fell off the bed. The trial was essentially a contest between experts. Dr. Robert Gold, a pediatric ophthalmologist testified that, consistent with “shaken baby syndrome,” the child had hemorrhages in all layers of the central retina of each eye, with no sign of external ocular trauma. The doctor opined that he would not expect to see retinal hemorrhage result from a fall from a thirty-two-inch high bed on to a carpeted floor. Dr. John Tilelli, an intensive care physician, testified that the CAT scan showed subdural blood, which usually occurs as a result of a direct impact. Moreover, the doctor testified that the child had both a translational or impact injury and also a rotational injury, and the child’s history of falling off the bed was not consistent with the injuries or their severity. His opinion was that the child suffered shaken baby syndrome, or whiplash impact syndrome. The doctor explained that when a child is violently shaken, the head rocks to and fro, causing the child’s brain to twist and turn. The twisting and turning causes injury to the brain and subsequent swelling. Dr. Tilelli testified that in twenty years, he had never seen a child with as severe an injury from a fall off a bed. He testified that it was likely that the injuries resulted from child abuse. Dr. Gary Pearl also testified for the State as an expert. He testified that the child’s head injuries were consistent with shaken baby syndrome. Dr. Merle Reyes also opined that this was a case of shaken baby syndrome.
 
 [1]
 

 
 *52
 
 The defense called two expert witnesses. Dr. Ljubisa Dragovic testified that the child died of blunt force trauma to the head and not from shaking. Dr. Jonathon Plunkett, who is perhaps the most widely known “shaken baby syndrome” skeptic, testified that short distance falls can cause serious injury and death and that the child’s death was caused by a subdural hematoma. He thought it unlikely that the injury was caused by a roll off the bed, and found it more likely that the child was standing or jumping when he fell off the bed.
 

 Following the verdict, Caban filed a motion for new trial. The trial judge expressed concern over improper impeachment of the defense experts through the testimony of the State’s experts:
 

 Because this was a battle of the experts, it does concern me that there was an improper impeachment of the defense experts in the case. There is clear case law that says one expert cannot comment on the qualifications of another expert, and without objection, the state questioned their experts about the qualification of the defense experts.
 

 The judge further observed the prejudice suffered by Caban as a result of the improper impeachment:
 

 And I think anybody who sat through the trial could see almost the physical reaction of the jury when one of the state’s experts described the defense experts as simply folks who travel around the country and testify for defendants to try and get them off in serious cases. It’s almost as if the jurors just shut down and didn’t care what else the defense experts had to say.
 

 Because defense counsel did not object to this improper testimony, the trial judge ruled the impeachment issue would have to be raised in a post-conviction proceeding.
 

 In this rule 3.850 proceeding, Caban argues that defense counsel was ineffective for failing to object and to preserve for appellate review improper impeachment of Dr. Plunkett by the State’s expert witnesses. Caban first complains about Dr. Pearl, who had given direct testimony for the State supporting the theory of shaken baby syndrome, particularly the characteristic of retinal hemorrhage. Defense counsel cross-examined him by asking about his efforts to keep up with all medical journals, and asked if he was familiar with four studies, including Dr. Plunkett’s paper, which posit that short distance falls can cause subdural hemorrhages. Dr. Pearl testified that he had read three of the studies, including Dr. Plunkett’s paper, but expressed the view that their opinion was “a very small minority.” On re-direct examination, the prosecutor elicited testimony from Dr. Pearl that an ad hoc committee of the National Association of Medical Examiners [“NAME”] held a position in direct opposition to the positions of Dr. Plunkett, and that an article compiled by Dr. Mary Chase, of the ad hoc committee, also rejected Dr. Plunkett’s views. The article was not entered into evidence, however. There was no defense objection.
 

 Defense counsel also failed to object when State expert witnesses, Drs. Tilelli, Reyes, and Alexander, attacked the credibility of Dr. Plunkett. Dr. John Tilelli testified that Dr. Plunkett’s opinion was not supported or substantiated by his data and that Dr. Plunkett’s interpretation of his data is incorrect. Dr. Reyes was asked on cross-examination whether she ever testified for the defense, and Dr. Reyes answered in the negative, but then volunteered that “people who will testify for the defense are paid.” Dr. Reyes was also asked whether particular experts were used by defense attorneys all over the country, and Dr. Reyes answered in the affirmative. Dr. Reyes also agreed with
 
 *53
 
 the prosecutor that if you “[want] to make a lot of money” you put your name on a defense attorney list, and that when these defense experts become known in their fields, their income substantially increases.
 

 The prosecutor also elicited testimony concerning Dr. Plunkett by asking Dr. Alexander: “And the majority of opinion you indicated in the pediatric community, are you also aware of the opinion of the other associations in the medical community as far as his [Plunkett’s] article and his testifying?” Dr. Alexander testified that “the National Association of Medical Examiners has a position paper on abusive head trauma, which basically is the same as the position paper the American Academy of Pediatrics has, and that’s really a huge variance with Dr. Plunkett.” Dr. Alexander further expressed the opinion that Dr. Plunkett’s conclusions were not generally accepted by the medical community, and that his data was “soft.” Dr. Alexander testified that Dr. Plunkett’s conclusions “are not accepted as even following from his own data.” Dr. Alexander further testified that he had heard of Dr. Plunkett because of his testifying for defense attorneys in cases of child abuse. Dr. Alexander also testified that in the last several years, the number of cases where he was called in had increased because the defense had retained experts like Dr. Plunk-ett.
 

 Caban contends that an expert witness may not testify about the credibility of another witness and asserts that the attack upon Dr. Plunkett was exacerbated by inadmissible hearsay as to the opinions of NAME and Dr. Chase. He claims counsel was ineffective for failing to object.
 

 Caban is correct that an expert may not comment on the credibility of other witnesses and that this was improper impeachment.
 
 See e.g.,
 
 § 90.706, Fla. Stat. (2007);
 
 Sanchez v. Nerys,
 
 954 So.2d 630 (Fla. 3d DCA),
 
 rev. denied,
 
 969 So.2d 1014 (Fla.2007);
 
 Linn v. Fossum,
 
 946 So.2d 1032 (Fla.2006);
 
 Morgan v. State,
 
 639 So.2d 6, 12 (Fla.1994);
 
 Carver v. Orange County,
 
 444 So.2d 452, 454 (Fla. 5th DCA 1983) (improper to impeach an expert witness by eliciting from another expert witness what he thinks of that expert).
 

 A successor judge heard the post-conviction motion. He ruled that the prosecutor’s re-direct of Dr. Pearl was proper because the defense opened the door on cross-examination. The successor judge also denied relief on the basis that Dr. Tilelli and Dr. Alexander were merely commenting on the validity of the shaken baby syndrome theory and articles published in opposition to it, rather than the credibility of Dr. Plunkett personally, and that Dr. Reyes was appropriately responding to an attack on her own credibility based on never having testified for the defense. However, we conclude the State expert witnesses crossed the line in attacking Dr. Plunkett.
 

 Questions that seek to elicit an opinion of the witness critical of the validity of the opinions by the opposing party’s expert are improper.
 
 See Carlton v. Bielling,
 
 146 So.2d 915 (Fla. 1st DCA 1962). An expert may properly explain his opin ion on an issue in controversy by outlining the claimed deficiencies in the opposing expert’s methodology, so long as the expert does not attack the opposing expert’s ability, credibility, reputation or competence.
 
 See Network PubVs, Inc. v. Bjork-man,
 
 756 So.2d 1028 (Fla. 5th DCA 2000). It is not improper to pose a question in a way to cause one expert to delineate the factors used in forming the opposing expert’s opinion and then do the same as to his own opinion, and compare the predicates upon which the two opinions are
 
 *54
 
 based.
 
 See Nowitzke v. State,
 
 572 So.2d 1346 (Fla.1990);
 
 Mathis v. O’Reilly, 400
 
 So.2d 795 (Fla. 5th DCA 1981).
 
 See also Schwab v. Tolley,
 
 345 So.2d 747 (Fla. 4th DCA 1977);
 
 Ecker v. Nat’l Roofing, Inc., 201
 
 So.2d 586 (Fla. 3d DCA 1967). Dr. Plunkett can be questioned as to possible bias in testifying for the defense, or asked about contrary opinions in authoritative literature, but the place to do so is on cross-examination of Dr. Plunkett, not through disparagement by other experts.
 

 The failure to object appears to have been prejudicial in this circumstantial evidence case where expert opinion testimony was crucial to both sides, as the judge who tried this case observed. An evidentiary hearing should be held on this rule 3.850 issue. We find no merit to the other issues raised in the motion.
 

 , AFFIRMED in part; REVERSED in part; and REMANDED.
 

 SAWAYA and MONACO, JJ., concur.
 

 [1]
 

 . After the defense rested, the State called one more expert witness, Dr. Randall Alexander, a professor of pediatrics, who testified that, in his opinion, lo a reasonable degree of medical certainty, the case was one of shaken baby syndrome.